2011 OK CR 17

**James CODDINGTON, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. D–2008–655.

Court of Criminal Appeals of Oklahoma.

May 13, 2011.

Cathy Hammarsten, Faustine Curry, Assistant Public Defenders, Oklahoma City, OK, for appellant at trial.

Sandra Elliot, Suzanne Lister, Assistant District Attorneys, Oklahoma City, OK, for State at trial.

Marva A. Banks, Andrea Digilio Miller, Assistant Public Defenders, Oklahoma City, OK, for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, for appellee on appeal.

## OPINION

SMITH, Judge.

¶ 1 James A. Coddington was tried by jury and convicted of Murder in the First Degree

in violation of 21 O.S.1991, § 701.7, in the District Court of Oklahoma County, Case No. CF–97–1500. In accordance with the jury's recommendation, the Honorable Jerry D. Bass imposed a sentence of death. This Court affirmed Coddington's conviction, but reversed the sentence, and remanded the case for resentencing. *Coddington v. State*, 2006 OK CR 34, 142 P.3d 437. A resentencing trial was held June 9–16, 2008. The jury found that the murder was heinous, atrocious or cruel, that Coddington committed the murder to avoid arrest or prosecution, that Coddington had been previously convicted of a felony involving the use or threat of violence, and that Coddington posed a continuing threat to society. In accordance with the jury's recommendation the Honorable Jerry D. Bass imposed the death penalty. Coddington appeals from this sentence and raises eighteen propositions of error in support of his appeal.

¶ 2 The full facts of the case are set forth in *Coddington*, 2006 OK CR 34, ¶¶ 3–8, 142 P.3d at 442. Briefly, Coddington, a recovering drug addict, resumed using crack cocaine in March, 1997. On March 5, 1997, Coddington visited his friend Albert Hale at Hale's home, hoping to borrow money for crack cocaine. Coddington knew Hale routinely carried large amounts of cash. Hale refused to loan Coddington money and asked him to leave. Coddington picked up a claw hammer in Hale's kitchen, hit Hale at least three times in the head, and took $525.00 from Hale's pocket. Coddington left Hale for dead, but Hale regained consciousness, tried to clean himself up, and lay down in bed. He was found by his son several hours later, semiconscious and in pain. Hale died at the hospital approximately a day later. In the days immediately before and after his attack on Hale, Coddington robbed several gas stations and convenience stores, threatening the clerks at knifepoint. Coddington was arrested and confessed to the robberies and murder. He expressed remorse for Hale's death.

## JURY SELECTION

¶ 3 Coddington claims in Proposition II that the trial court violated his right to a fair and impartial jury by removing prospective jurors for cause over objection and absent proper questioning, before it was adequately established that those jurors could not follow the law and consider the death penalty. Because Coddington had already been found guilty of first degree murder, the primary issue in jury selection was whether potential jurors could consider all three punishments. Coddington complains that the trial court removed 22 jurors for cause because the jurors were unable to consider imposing the death penalty, over his objection and without allowing him to rehabilitate the jurors. Of these 22 potential jurors, five were questioned as alternates.[1] Coddington cannot show prejudice from any alleged error which may have occurred when questioning these jurors, as the record does not show any alternate jurors sat on Coddington's jury. *Black v. State*, 2001 OK CR 5, ¶ 87, 21 P.3d 1047, 1075; *Powell v. State*, 2000 OK CR 5, ¶ 36, 995 P.2d 510, 522.

¶ 4 Coddington objected to excusal of each juror on the grounds that he was entitled to jurors representing a fair cross-section of the community, including people opposed to the death penalty. This is not an accurate statement of law. "A prospective capital juror should be excused for cause when the juror's views on capital punishment would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.'" *Sanchez v. State*, 2009 OK CR 31, ¶ 44, 223 P.3d 980, 997, *quoting Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). A juror who would under no circumstances vote for capital punishment is not impartial and must be removed for cause. *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992). On its face Coddington's objection would have required the trial court to allow on the panel a juror who could not fulfill her duties and would be ineligible to serve. It is possible that the defense attorney intended to say that Coddington had a right to a jury which included people who objected generally to the death penalty, as long as those persons

1. Prospective jurors R.C., W.C., C.D., J.W. and S.D. were questioned as alternate jurors.

were willing to consider imposing the death penalty in this case. This is true. The trial court should not excuse for cause persons who oppose in principle, harbor doubts or express scruples regarding imposition of the death penalty, as long as those persons can consider the punishment. *Witherspoon v. Illinois*, 391 U.S. 510, 522–23, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776 (1968). Whether the issue was properly preserved or not, there was no error in jury selection.

¶ 5 *Voir dire* examination allows both sides to gather enough information about prospective jurors to discover grounds for challenges for cause, and to permit the intelligent use of peremptory challenges. *Sanchez*, 2009 OK CR 31, ¶ 44, 223 P.3d at 997. The manner and extent of *voir dire* are within the trial court's discretion. *Id.* A capital juror must be willing to consider all three punishments provided by law. *Hogan v. State*, 2006 OK CR 19, ¶ 17, 139 P.3d 907, 918; *Mitchell v. State*, 2006 OK CR 20, ¶ 39, 136 P.3d 671, 688–89. Jurors need not flatly say they will automatically vote against the death penalty, and a juror's bias need not be proved with unmistakable clarity. *Jones v. State*, 2009 OK CR 1, ¶ 14, 201 P.3d 869, 877; *Hanson v. State*, 2003 OK CR 12, ¶ 10, 72 P.3d 40, 48. Because the trial court is in a position to assess each juror's response to questions, including non-verbal responses which may not appear in a cold transcript, we defer to the trial court's personal observations. *Harmon v. State*, 2011 OK CR 6, ¶ 14, 248 P.3d 918, 929; *Jones*, 2009 OK CR 1, ¶ 14, 201 P.3d at 877.

¶ 6 Coddington complains that the trial court did not question jurors correctly. This Court has upheld the "always" and "never" line of questions similar to that used here. *Harmon*, 2011 OK CR 6, ¶ 22, 248 P.3d at 930–31; *Stouffer v. State*, 2006 OK CR 46, ¶¶ 14–16, 147 P.3d 245, 257. The trial court correctly instructed jurors regarding aggravating circumstances, mitigating evidence, the three punishments provided by law, and the jury's duty to consider all three punishments. The trial court explained that jurors could only consider the death penalty if they found at least one aggravating circumstance beyond a reasonable doubt, and then unanimously found that the aggravating circumstance outweighed any mitigating evidence. The trial court asked jurors whether they could give meaningful consideration to all three possible alternative penalties. The court told potential jurors that each had to keep an open mind and consciously, and conscientiously, consider all three punishments. After this, the trial court told jurors that some people would "always" impose the death penalty and others would "never" do so. He asked each juror if he or she was in either of those categories. The trial court excused the jurors who said they would "always" impose the death penalty. Coddington did not object to this procedure and in fact joined the State in asking that the "always" panelists be excused for cause. Coddington also asked that one prospective alternate juror who answered "always" be excused for cause.

¶ 7 Despite accepting the process for jurors who would automatically impose the death penalty, Coddington claims the trial court improperly excused the jurors who said they were included in the "never" category. These prospective jurors were questioned individually regarding their ability to consider the death penalty in this particular case. The trial court told each juror the law required them to meaningfully consider all three punishments, asked if he or she could do so, and asked whether each juror was irrevocably committed to a position on punishment before the trial began. Contrary to Coddington's claim, fifteen prospective jurors unequivocally stated they would or could not consider imposing the death penalty in this case.[2] The trial court asked the prospective jurors if they refused to give the death penalty in this case no matter what the law and evidence were, if they refused to deliberate or would be unable to deliberate, and if they could follow the law. The trial court asked each panelist if they were firm in their an-

---

2. These potential jurors were B.J., B.K., J.B., D.E., S.L., P.S., T.S., K.W., C.O., J.D., D.S., J.K., T.H., A.G., and J.B.

swer and convictions. Before excusing each of these fifteen jurors, the trial court made a record noting his observations of jurors as they answered, and finding that the jurors could not deliberate, were not impartial and were not eligible to serve. The trial court's questions did not directly quote the language approved in the uniform jury instructions, but the questions sufficiently identified the jurors who were ineligible to serve because they could or would not consider the death penalty in this case, regardless of the law or facts presented. *Harmon,* 2011 OK CR 6, ¶ 22, 248 P.3d at 931; *Williams v. State,* 2001 OK CR 9, ¶ 13, 22 P.3d 702, 710.

¶ 8 Coddington complains that prospective juror M.M. was improperly excused for cause over his objection, but this is not supported by the record. M.M. refused to pass judgment on anyone, or impose any sentence, because of religious beliefs. Coddington joined in the State's motion to excuse M.M. for cause.

¶ 9 Coddington also complains the trial court erred in excusing prospective juror C.K. The trial court was remarkably patient and painfully thorough in offering C.K. an opportunity to fully answer the questions before eventually excusing her for cause. She initially was silent when asked whether she could give meaningful consideration to all three punishments, because she was not irrevocably committed to a position. However, C.K. stated she could not live with herself if she were required to impose the death penalty. The trial court continued to question C.K. throughout the first day of *voir dire,* before and after a lunch break. C.K. several times expressed concern about her inability to impose the death penalty, but would not absolutely state she could not consider it. The record shows that C.K. was, at best, internally conflicted about the issue. The State questioned panelists about the death penalty during the second day of *voir dire.* C.K. confirmed that she was very emotional and had tears in her eyes during both days of questioning. C.K. became nauseated during *voir dire* of other jurors on the issue. She told the State that she could not assure the court she could fulfill her duty as a juror and either consider or actually vote for the death penalty. The trial court asked whether she was firm in her conviction and C.K. replied, "That I cannot give you 100% assurance, yes, I am." Over Coddington's objection the trial court struck C.K. for cause. The record supports the trial court's conclusion that C.K. could not fulfill her duty as a juror. The trial court noted that C.K. had an agonized look on her face and tears in her eyes throughout *voir dire.* Even by transcript, C.K.'s discomfort and inability to follow the law are palpable. We defer to the trial court's observation of C.K.'s responses and demeanor. *Jones,* 2009 OK CR 1, ¶ 20, 201 P.3d at 878.

¶ 10 Coddington claims the trial court erred in failing to allow him to rehabilitate the jurors who stated they could not impose the death penalty. Where the trial court has appropriately questioned prospective jurors regarding their eligibility to serve on a capital jury, it is not error to deny defense counsel a chance to rehabilitate jurors excused for inability to impose the death penalty. *Harmon,* 2011 OK CR 6, ¶ 21, 248 P.3d at 930; *Littlejohn v. State,* 2004 OK CR 6, ¶ 49, 85 P.3d 287, 301–02. Looking to the entire *voir dire* examination, the record clearly supports a conclusion that the trial court did not abuse its discretion in excusing these jurors for cause. *Jones,* 2009 OK CR 1, ¶ 14, 201 P.3d at 877.

¶ 11 In Proposition III Coddington claims the trial court violated his right to a fair and impartial jury by denying him the use of jury questionnaires and/or individual sequestered *voir dire.* The trial court denied Coddington's pretrial request for individual *voir dire* and for the use of jury questionnaires. Without objection, the trial court used the "struck juror" method of jury selection.[3] Coddington complains that the trial court should have used jury questionnaires and questioned each juror individually. He ar-

---

**3.** Thirty jurors at a time were questioned. When potential jurors were excused for cause, they were replaced so that thirty potential jurors remained on the panel. These were then passed for cause and, after each party used nine peremptory challenges, twelve jurors remained to be sworn in. Alternates were chosen separately, after the jury was selected.

gues that use of these tools is the most effective means of discovering a potential juror's bias, and that the failure to question jurors individually undermined the reliability of his sentencing proceedings.

¶ 12 This Court has encouraged the use of both jury questionnaires and individual *voir dire* in capital cases. *Jones v. State*, 2006 OK CR 17, ¶ 16, 134 P.3d 150, 156. However, we have consistently refused to require trial courts to use questionnaires or individual *voir dire*. *Id.* The decision to use either individual *voir dire* or jury questionnaires is within the trial court's discretion. *Cuesta–Rodriguez v. State*, 2010 OK CR 23, ¶¶ 56–58, 241 P.3d 214, 233. A defendant has no automatic right to individual *voir dire*, though it is appropriate where the record shows jurors are not candid, or are trying to avoid jury service through their responses. *Stouffer*, 2006 OK CR 46, ¶ 12, 147 P.3d at 257. Jury questionnaires are useful to screen for juror bias in capital cases, *Eizember v. State*, 2007 OK CR 29, ¶ 40 n. 6, 164 P.3d 208, 221 n. 6. However, the trial court and both parties were allowed to thoroughly question potential jurors, not only on their opinions regarding the death penalty, but for a wide range of potential biases. We defer to the trial court's ability to personally evaluate the honesty and openness of potential jurors' responses. *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 58, 241 P.3d at 233.

¶ 13 Coddington argues generally that jurors may have been uncomfortable airing biases and opinions when questioned in open court. He also complains that jurors were asked whether they could follow the law without knowing what the law was. It is unclear whether Coddington means jurors did not understand the nature of the proceedings, or did not know the law which would apply in this case. The record suggests the former is not correct; potential jurors were instructed on trial procedure and, at great length, received instruction on capital sentencing. As far as Coddington's claim that jurors may not have known the specific laws which applied here, that is the point of asking whether jurors can follow the law: a juror takes an oath to follow the law given by the trial court, and has no discretion

to refuse to follow laws with which she may not agree. Coddington fails to identify any specific questions he would or could have asked prospective jurors, either on a questionnaire or during individual *voir dire*. The record shows that the method of jury selection used at trial allowed Coddington to explore biases which would support a challenge for cause, and to obtain information necessary for him to intelligently exercise his peremptory challenges. The trial court did not abuse its discretion in denying Coddington's requests for individual *voir dire* and jury questionnaires. Coddington's right to a fair and impartial jury was not violated.

¶ 14 In Proposition IV, Coddington claims the excusal of potential jurors for cause on grounds that they could not impose the death penalty violates Okla. State. Tit. 22, § 660(8). Coddington argued in Propositions II and III that the trial court erred in failing to ascertain whether each juror, individually, could fulfill his or her oath and consider imposing all three punishments provided by law. In doing so, Coddington both acknowledges and relies on the large body of case law which requires jurors to consider all three punishments, and which holds that a juror who cannot consider imposing the death penalty is not eligible to serve on a capital jury. In Proposition IV, Coddington asks the Court to completely disregard all this law. He argues that, based on language in a state statute dating from 1910, jurors in a capital resentencing trial cannot be excused for cause for refusing to consider imposing the death penalty. Assuming Coddington's statutory argument were correct—which it is not—it would necessarily fail given the constitutional requirements imposed on capital case jurors.

¶ 15 In 1910, the Legislature enumerated circumstances in which *voir dire* challenges for implied bias would be allowed. 22 O.S.2001, § 660. Regarding capital cases the statute provides: "If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty of, in which case he shall neither be permitted nor compelled to serve as a juror." 22 O.S.2001, § 660(8). Coddington argues that this language restricts challenges for cause to those

conscientious opinions which go only to guilt of the charged offense of murder, not opinions which would preclude imposition of a particular punishment. This Court has rejected this claim in the past, holding that where an Information alleges murder the punishment to be assessed by the jury is part of the verdict. *Davis v. State*, 1983 OK CR 57, ¶¶ 21–22, 665 P.2d 1186, 1194; *Gibson v. State*, 1972 OK CR 249, ¶¶ 30–31, 501 P.2d 891, 898. Coddington correctly notes that *Gibson* was decided before the current two-stage capital trial scheme was enacted, and *Davis* merely followed *Gibson* without discussing the effect, if any, of the change in the capital punishment statutes. We recently relied on these two cases to reject this claim without further discussion. *Harmon*, 2011 OK CR 6, ¶ 23, 248 P.3d at 931. The procedure by which a jury recommends a sentence of death has changed. However, the underlying reasoning of *Gibson* remains valid. An Oklahoma capital jury may return a verdict of death, but is unable to do so unless it has first returned a verdict of guilt for murder. Section 660(8) does not prohibit a trial court from excusing for cause a juror who will not consider imposing the death penalty.

## TRIAL COURT'S PRESENCE DURING TRIAL

¶ 16 In Proposition I, Coddington claims the trial court left the bench during presentation of the videotape of Gayla Hood's testimony, offered in mitigation. He argues that the trial court's absence amounts to structural error which affected the entire trial and requires reversal without a showing of prejudice. This proposition requires us to consider three different questions: (1) Is it error for the trial court, unannounced, to leave the courtroom during the trial; (2) Is this error structural, or is it subject to harmless error analysis; (3) Did this happen—did the trial court leave the bench—in this case? We answer the first question "yes". As the discussion below shows, trial judges should remain on the bench during trial proceedings. They should not leave the courtroom, and particularly should not leave without an announcement and explanation to the parties.

¶ 17 At the outset we note that we cannot establish the truth of the third question. There is no evidence by which this Court can conclusively establish that the trial court left the courtroom in this case. As we discuss below, the state of the record is such that an evidentiary hearing will not establish the facts with more certainty than is now before the Court. Coddington admits that the record completely fails to support his claim that the trial court left the bench at any time during the trial, and particularly during Hood's videotape. Hood's videotape was initially marked as Defendant's Exhibit 12 and later renumbered as Court's Exhibit 12. Both parties and the trial court had seen the exhibit. The tape was admitted and played by agreement, and neither party made any objections while the tape was played. Regarding this exhibit the transcript states: "At which time Defendant's Exhibit Number 12 was published to the jury, after which the following proceedings were had in open court." Nowhere in the record do any comments, objections or notations suggest that anyone in the courtroom noticed whether the trial court left the bench then or at any other time.

¶ 18 In connection with this proposition, Coddington filed a document which is, in the alternative, a "Notice of Extra-record Evidence" or a Rule 3.11 Motion to Supplement the Direct Appeal Record Or For An Evidentiary Hearing. Coddington wants this Court to review as part of the appellate record three affidavits he includes in support of that Motion. Coddington's investigator, Laura Sams, avers that she sat at defense table during the trial, and saw the trial judge leave the bench for about five minutes during Hood's videotape. Coddington's second chair defense attorney, Faustine Curry, avers that she saw the trial court leave the bench during Hood's videotape, and that she neither consented to this nor had notification from the trial judge that he intended to leave. Coddington's lead defense counsel, Catherine C. Hammarsten, avers that she did not consent to the trial court's leaving the bench and was not notified that the trial court intended to leave; Hammarsten does not aver that she saw the trial court leave the bench.

¶ 19 The State, without specifically urging the Court to accept Coddington's affidavits, provides the Court with an affidavit from the trial judge, the Honorable Jerry D. Bass. Judge Bass avers that he does not recall leaving the bench during Hood's testimony. He recalls that the courtroom was darkened and the jury was facing away from the bench as they watched the video. Coddington does not dispute this description. Judge Bass further states, "However, I do recall having to leave the bench once in my career for a very brief bathroom break which lasted no more than a minute or two. I very quietly left and returned without disturbing the jury." Judge Bass notes that the bathroom was adjacent to and a few feet from the courtroom. He notes, "No attorney has ever objected or moved for mistrial nor has any juror contacted this Court to say they observed the absence or that the absence affected their deliberation and verdict." Just in case the bathroom break might have occurred during Coddington's trial, Judge Bass states: "I have full confidence this brief restroom break did not disturb, influence or affect the jury's viewing of the videotape."

¶ 20 Coddington argues that his affidavits provide the evidence lacking in the trial record to support his claim in Proposition I. He asks this Court to accept and review the affidavits under Rule 3.11. This poses an interesting procedural question. The usual method of supplementing the appellate record is through Rule 3.11(B). This Rule allows for supplementation under two circumstances where the complete record is not transcribed or the complete record is not transmitted; neither one is at issue here. Rule 3.11(B)(1), (2), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2010). Rule 3.11(B) strictly limits supplementation with extra-record material to two circumstances: where matters were timely admitted as part of a motion for new trial, and in connection with a claim that trial counsel failed to investigate and/or use evidence which could have been available during the trial; it is in connection with this subsection that a defendant may request an evidentiary hearing. Rule 3.11(B)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2010). Neither of those

circumstances is present here. Coddington does, in Proposition XV, claim that counsel's failure to object to the trial court's absence constitutes ineffective assistance. However, in Proposition I, Coddington asks this Court to reach the substantive issue of the effect of the trial court's absence. Thus, Rule 3.11(B)—the avenue through which defendants may supplement the record with extra-record material and request evidentiary hearings—is not procedurally available to Coddington.

¶ 21 This Court may review Coddington's submitted extra-record material only under Rule 3.11(A). That section provides: "After the Petition in Error has been timely filed in this Court, and upon notice from either party or upon this Court's own motion, the majority of the Court may, within its discretion, direct a supplementation of the record, when necessary, for a determination of any issue; or, when necessary, may direct the trial court to conduct an evidentiary hearing on the issue." Rule 3.11(A), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2010). This provision is seldom used. However, it is appropriate to employ it in this capital resentencing trial, where the Court should conduct a thorough and painstaking review of each claim. We grant Coddington's motion to supplement the record with extra-record material under Rule 3.11(A), and review both his submitted affidavits and that of the State in deciding this proposition.

¶ 22 Even with the extra-record material, the evidence before this Court regarding this claim is sparse. The trial record offers no support for Coddington's assertion that the trial judge left the bench. Coddington offers two affidavits stating his investigator and second chair attorney saw the trial judge leave the bench. His lead defense attorney did not. Neither she nor the second chair attorney had notice that the court might leave the bench, and did not consent to his absence. Judge Bass states he does not recall leaving the bench during this trial, but that he recalls he did so, briefly, once during his career on the bench. He states he is certain that, if that occurred in this trial, it had no effect on the jury's viewing of the

evidence. Given these conflicting statements, it appears that remand for an evidentiary hearing on this issue would not be helpful. Two members of the defense team are already on record as saying the trial judge left. The trial judge says he didn't, or at least he is almost sure that he didn't. Lead defense counsel didn't see the trial judge leave. It is possible that members of the prosecution team could, at an evidentiary hearing, add their recollection to this. However, essentially any evidentiary hearing would come down to a determination of which conflicting statement to believe. This decision will in some sense always be arbitrary, whether made by this Court or a lower court.

¶ 23 A definitive conclusion about what actually happened at trial is not necessary to resolution of Coddington's legal claim. This Court finds it is in the interests of justice and judicial efficiency to reach the legal issue raised by this proposition without recourse to an evidentiary hearing. In so doing, we do not answer the third question posed by this proposition, "Did the trial court leave the bench in this case?" We explicitly find that we are unable to answer that question.

¶ 24 We turn to the second question—Is this error structural or subject to harmless error analysis? The substantive issue raised by Coddington is important: whether structural error occurs when a trial judge leaves the bench during trial proceedings. In the interests of justice and judicial economy the Court reaches this substantive issue. To do so, we assume without deciding that Coddington is correct and the trial court briefly left the bench during Hood's videotape. We emphasize that the discussion that follows is not based on any finding that such an event occurred. This Court expresses no opinion regarding the accuracy of Coddington's factual claim. For purposes of analysis we will take the claim at face value. We further take at face value Coddington's assertion that references to leaving the bench are intended to mean that the trial judge left the courtroom. As the State notes, these two concepts are not the same. A judge may step down from the bench and remain in the courtroom. However, in context Coddington's affidavits suggest that the affiants intended to state the judge left the courtroom. This conclusion is reinforced by Judge Bass's own affidavit, in which he refers to an occasion where he left the courtroom entirely by saying he left the bench. To repeat, for purposes of this proposition this Court assumes without deciding that the trial judge briefly left the courtroom while Hood's videotape was played for jurors.

¶ 25 Coddington argues that it is always structural error when a trial court leaves the bench. Most constitutional errors are subject to harmless error analysis. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Trial errors are those which occur when evidence is presented, and may be assessed along with other evidence to determine whether the error prejudiced the defendant. *Arizona v. Fulminante*, 499 U.S. 279, 307–08, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991). Structural errors, by contrast, affect the conduct of the entire trial and cannot be separated from it for purposes of analysis. *Fulminante*, 499 U.S. at 309–10, 111 S.Ct. at 1265. "Structural errors are those which affect a trial from beginning to end, such as the absence of counsel for a defendant, a biased judge, the unlawful exclusion of members of the defendant's race from a grand jury, the right to self-representation at trial, and the right to a public trial." *Golden v. State*, 2006 OK CR 2, ¶ 15, 127 P.3d 1150, 1154. "[I]t is clear that when the Supreme Court speaks of structural error, the Court is referring to something which affects the entire framework of the trial and not something which may have differing degrees of impact, depending on other trial factors." *State v. Langley*, 958 So.2d 1160, 1167–68 (La.2007). Because structural errors are part and parcel of the fabric of a trial, they cannot be separated from it and are not subject to harmless error analysis. *Golden*, 2006 OK CR 2, ¶ 16, 127 P.3d at 1154.

¶ 26 As Coddington argues, a judge's presence in the courtroom during the presentation of evidence is at the heart of the jury trial system. *Capital Traction Co. v. Hof*, 174 U.S. 1, 13–14, 19 S.Ct. 580, 585, 43 L.Ed. 873 (1898). However, this does not automati-

cally mean that a judge's absence creates structural error. Jurisdictions have split on the issue. This Court has not fully discussed this question since *Fulminante* was decided. For all practical purposes the Court has treated the issue as one of trial error; we have refused to grant relief where a defendant failed to show prejudice from a judge's absence. In *Grant v. State*, 1963 OK CR 86, 385 P.2d 925, the trial court absented itself briefly during a period where there were no proceedings and nobody approached jurors. This Court found that the defendant failed to show any error deprived him of a fair trial. *Id.*, ¶¶ 15–16, 385 P.2d at 928. The Court reached the same conclusion where the trial judge stepped briefly away from the bench, remained within hearing of the proceedings and available to rule on any objections, and did not lose control of the proceedings. *Blagg v. State*, 36 Okl.Cr. 337, 254 P. 506, 509 (1927). This Court has reversed where the trial court's absence from the bench amounted to a loss of control of the proceedings. *Ridenour v. State*, 94 Okl.Cr. 92, 231 P.2d 395, 406 (1951) (judge absent for most of closing argument and unable to rule on objections); *Tunnell v. State*, 24 Okl.Cr. 176, 216 P. 951, 952–53 (1923) (judge absent when verdict received, error even though parties consented to substitution of local attorney for the trial judge); *Allen v. State*, 13 Okl.Cr. 533, 165 P. 745, 747–48 (1917) (judge absent when verdict received, error even though parties consented to substitution of local attorney for the trial judge); *Wright v. State*, 7 Okl.Cr. 280, 123 P. 434, 435 (1912) (judge walked to the back of the courtroom, out of the hearing and control of the proceedings). This Court reversed a case without any discussion of prejudice where the trial judge conducted other business in his chambers during closing argument. *Stites v. State*, 9 Okl.Cr. 596, 132 P. 822, 823 (1913). *Cochran v. State*, 4 Okl.Cr. 379, 111 P. 974 (1910), was factually similar to this case in that the record did not indicate the judge had left the courtroom and the defendant sought to present his case at the motion for new trial based on affidavits. This Court did not address the defendant's claim on its merits, but held that, in the future, the trial judges should remain present and in control of the courtroom. In

dicta the Court noted that, even then, jurisdictions were split on the nature of the error, and remarked, "We are not, however, disposed to apply the doctrine of consent or of harmless error to this question." *Cochran,* 111 P. at 978. As the cases discussed above show, this Court subsequently has applied both consent and harmless error in resolving these issues.

¶ 27 Coddington relies on the Illinois Supreme Court's decision in *Illinois v. Vargas,* 174 Ill.2d 355, 220 Ill.Dec. 616, 673 N.E.2d 1037 (1996). In *Vargas* the judge left the bench during cross-examination of a State witness. The trial court could not hear and was not able to rule on objections made during the testimony, except by having the question read back upon his return. The court first concluded that, although Vargas had waived the issue by failing to object, the error was potentially of such magnitude that it warranted plain error review. *Vargas,* 220 Ill.Dec. 616, 673 N.E.2d at 1041. The court found that a judge's active presence during trial proceedings is essential to a fair trial. *Id.,* 220 Ill.Dec. 616, 673 N.E.2d at 1042. The court also determined that a judge's absence may create a negative impression on jurors, so "detrimental to the integrity and reputation of the judicial process as to constitute plain error and require reversal." *Id.,* 220 Ill.Dec. 616, 673 N.E.2d at 1042–43. The court concluded that a judge's absence during a felony trial was inherently prejudicial and *per se* reversible error. *Id.,* 220 Ill.Dec. 616, 673 N.E.2d at 1043.

¶ 28 A minority of other jurisdictions have found that a judge's absence is structural error and reversible without any showing of prejudice. A Florida appellate court has held that it is unworkable to require a showing of prejudice where a trial judge is absent during proceedings. *Peri v. State,* 426 So.2d 1021, 1027 (Fla.App. 3 Dist.1983). The court believed a prejudice requirement would not only be impractical, it would not sufficiently deter judges from leaving the courtroom, whereas certain reversal would act as a powerful deterrent to such behavior. *Id.* The Florida Supreme Court, considering a similar issue, held that although a trial judge's presence may be waived for some part of the

proceedings, it may not be waived when the jury wishes to communicate with the court during deliberations. *Brown v. State,* 538 So.2d 833, 836 (Fla.1989). Relying on *Brown,* a different division of the Florida appellate court has held that the trial court's absence during read-back of testimony, without a knowing and voluntary waiver by the defendant, constitutes reversible error *per se. Tovar v. State,* 867 So.2d 1206, 1207–08 (Fla. App. 4 Dist.2004). Connecticut also has found that, given the importance of the trial court's presence during proceedings, any absence is structural error and reversible without a showing of prejudice. *State v. Patterson,* 31 Conn.App. 278, 624 A.2d 1146, 1148–49 (1993); *State v. Smith,* 49 Conn. 376, 1881 WL 2185, *6 (Conn.1881) (no relief necessary where trial court left bench but may have been standing in more comfortable anteroom, within sight and hearing of courtroom).

¶ 29 Coddington relies on *Riley v. Deeds,* 56 F.3d 1117 (9th Cir.1995). In *Riley* the trial judge left the courthouse during jury deliberations, and the judge's law clerk convened the court and granted the jury's request that testimony be read back. The Ninth Circuit noted that it had not previously considered whether a judge's absence from the courtroom always constituted structural error, and refused to decide that question. *Riley,* 56 F.3d at 1120. The Court concluded that nature of the error in this case was structural. The judge's unavailability and complete failure to exercise discretion, regarding the jury's request to have testimony read back, meant that it was not possible to analyze the claim under an abuse of discretion standard. The law clerk granted the jury's request, the jury had control of what testimony was read, and the jury foreman indicated when jurors had heard enough. *Id.* The conviction was obtained after a proceeding in which there was no judge present and no judicial discretion exercised, one "abhorrent to democratic conceptions of justice," which could not be quantitatively assessed for prejudice. *Id.* The Ninth Circuit found that the trial judge's absence under these circumstances was structural error which was not subject to harmless error analysis.

¶ 30 The Ninth Circuit in *Riley* explicitly refused to hold that any judicial absence from the courtroom during trial proceedings is structural error. It is not the only federal court to reach that conclusion. The Tenth Circuit has recently rejected the argument that a judge's absence from the courtroom is structural error in every case. *United States v. Solon,* 596 F.3d 1206, 1212 (10th Cir.2010). The Tenth Circuit left open the question of whether, in some circumstances, a judge's absence might result in such a complete abdication of judicial process as to constitute structural error, holding that the issue was subject to harmless error review on a case-by-case basis. *Id.* Coddington relies on *United States v. Mortimer,* 161 F.3d 240, 241 (3d Cir.1998), but in that case the Third Circuit refused to find that a judge's absence amounts to structural error in every case. The Fourth Circuit reached the same conclusion in *United States v. Love,* 134 F.3d 595, 604–05 (4th Cir.1998). The Fourth Circuit noted that *Riley* had held a judge's absence was not, in itself, structural error, and held that where no objections were made, and the trial court explained its absence during argument to jurors, there was no plain error. *Id.* at 605. Discussing the defendants' argument that the judge's absence might have given jurors the impression the judge had made up his own mind, the court remarked, "A showing of prejudice cannot be based on such speculation." *Id. See also United States v. Kone,* 307 F.3d 430, 441–42 (6th Cir.2002); *United States v. Grant,* 52 F.3d 448, 449 (2d Cir.1995)(judge absent while testimony was read back during deliberations); *United States v. Pfingst,* 477 F.2d 177, 196–97 (2d Cir.1973)(judge absent during deliberations); *Haith v. United States,* 342 F.2d 158, 159 (3d Cir.1965)(judge absent during *voir dire*); *Heflin v. United States,* 125 F.2d 700, 701 (5th Cir.1942)(judge absent during defense closing argument); *Taylor v. United States,* 386 F.Supp. 132, 144–46 (E.D.Penn. 1974)(judge absent during *voir dire*).

¶ 31 The majority of state jurisdictions which have considered this issue require the defendant to show prejudice from a judge's absence before any grant of relief. Most courts, like those in *Solon, Riley* and *Mortimer,* analyze the effect of the judge's ab-

sence on the trial. As the Louisiana Supreme Court has noted, "analysis of the 'egregiousness of the conduct' or 'degrees of damage' is, in reality, the type of harmless error review that a court would use to analyze a trial error." *State v. Langley*, 958 So.2d 1160, 1168 (La.2007) (judge absent during *voir dire* and closing argument). *See also Berry v. State*, 282 Ga. 376, 651 S.E.2d 1, 6 (2007)(judge absent during *voir dire*, error only reversible where a party objects and defendant shows prejudice); *People v. Garcia*, 826 P.2d 1259, 1266 (Colo.1992)(failure to object waived error when judge absent while videotapes played); *People v. Salyer*, 80 P.3d 831, 837 (Colo.App.2003)(judge absent while videotapes played); *Jackson v. State*, 836 So.2d 915, 942–43 (Ala.Crim.App. 1999)(judge absent during videotape testimony and when court adjourned for day); *State v. Smith*, 256 Neb. 705, 592 N.W.2d 143, 147 (1999) (judge absent for videotaped testimony); *Sand v. State*, 467 So.2d 907, 908–10 (Miss.1985)(judge delegated duties and left courthouse during deliberations); *Hall v. State*, 497 N.E.2d 916, 918 (Ind.1986)(error reversible where defendant objected, judge's absence during *voir dire* ceded control of courtroom and left him unable to rule on objection); *McBrady v. State*, 459 N.E.2d 719, 722 (Ind.1984)(judge twice left jurors in care of bailiff, clearing the courtroom of spectators once, and allowed jurors to examine exhibits); *State v. James*, 110 Ariz. 334, 519 P.2d 33, 36 (1974)(judge absent for verdict); *People v. Perry*, 115 Mich.App. 533, 321 N.W.2d 719, 722 (1982)(judge absent during deliberations while testimony was read back); *People v. Morehouse*, 328 Mich. 689, 44 N.W.2d 830, 831–32, (1950)(judge absent during closing argument); *Bright v. State*, 165 Tex.Crim. 291, 306 S.W.2d 899, 900–01 (Tex. Crim.App.1957)(judge absent during *voir dire* ); *State v. Hinton*, 210 S.C. 480, 43 S.E.2d 360, 363 (1947)(judge absent during closing argument); *Mills. v. Commonwealth*, 240 Ky. 359, 42 S.W.2d 505, 508 (Ky.App. 1931)(judge absent and, according to local custom, local attorney presided by agreement during argument); *State v. McIntyre*, 132 Kan. 43, 294 P. 865, 867 (1931)(judge absent briefly during reading of exhibit); *State v. Twine*, 211 Iowa 450, 233 N.W. 476, 481 (1930)(judge absent during closing argument).

¶ 32 The New York Court of Appeals held that a judge's absence, relinquishing control of the proceedings, deprives a defendant of a fair trial. *People v. Toliver*, 89 N.Y.2d 843, 652 N.Y.S.2d 728, 675 N.E.2d 463, 464 (1996)(judge absent during *voir dire* ). However, that Court has more recently applied a harmless error analysis to the issue. *People v. Hernandez*, 94 N.Y.2d 552, 708 N.Y.S.2d 34, 729 N.E.2d 691, 693–94 (2000). The Court discussed *Toliver* and cases on which it was based, suggesting that the findings in those cases were in part predicated on whether a defendant objected or waived the issue, and on the effect of the trial court's absence on the proceedings. Finding that the trial court in *Hernandez* was able to make substantive rulings on the testimony read back in its absence, the Court of Appeals ruled the error did not require relief. New York thus does not consider a judge's absence to be structural error.

¶ 33 In concluding that a showing of prejudice is required before relief is warranted for this error, the North Carolina Supreme Court relied on the general state statute requiring prejudice before relief may be granted. *State v. Walters*, 357 N.C. 68, 588 S.E.2d 344, 352 (2003)(judge absent during *voir dire* ); N.C.G.S. § 15A–1443(a). Oklahoma has a similar statute, 20 O.S.2001, § 3001.1, which states: "No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or for error in any matter of pleading or procedure, unless it is the opinion of the reviewing court that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

¶ 34 Under circumstances similar to those here, the Colorado Supreme Court found that a judge may mitigate any potential prejudice by announcing that he is temporarily leaving the bench during the presentation of videotaped testimony, after explicitly deciding his presence was not necessary, and no objection is made. *Garcia*, 826 P.2d at 1265–

66. The Alabama Court of Criminal Appeals similarly concluded there was no prejudice where the trial judge explained his absence to jurors before leaving the bench while a videotape was played. *Jackson*, 836 So.2d at 943. The Nebraska Supreme Court approved the same procedure. *Smith*, 592 N.W.2d at 147.

¶ 35 As the Ninth Circuit noted in *Riley*, many of these cases involve an express or implied waiver of the judge's presence, either through written agreement or a failure to object. *Riley*, 56 F.3d at 1121. There is general agreement that a defendant may waive a judge's presence during at least portions of the proceedings. *See, e.g., Berry*, 651 S.E.2d at 6 (waiver express by agreement or implied by failure to object); *Hernandez*, 708 N.Y.S.2d 34, 729 N.E.2d at 693 (depending on circumstances, error may not be cured by consent, but waiver is implied by failure to object); *Brown*, 538 So.2d at 836; *Garcia*, 826 P.2d at 1266 (no error where parties consent, and failure to object waives error).

¶ 36 Noting again that we have not found the trial court left the bench, we summarize the facts before us. Taking the evidence in the light most favorable to the defendant, the courtroom was darkened. Jurors were facing the video screen, not the bench, watching a 46–minute long videotape. The videotape was Coddington's mother's emotionally affecting testimony in mitigation. The parties, and the trial court, had seen the videotape and it was admitted by agreement. No objections were made, on substantive or any other grounds, during the playing of the tape. During this time, the trial judge may have left the courtroom briefly. The judge's recollection is that, if this happened, it was for a minute or two. A defense intern avers that she timed the judge's absence at five minutes. Although she and second chair defense counsel both say they saw the trial judge leave, neither they nor the first chair counsel objected at the time or made a record of the incident at any other time during the remainder of the trial. There is no evidence suggesting that any juror saw the trial court leave, if he left, or was affected by the sight.

¶ 37 We answer Coddington's question narrowly. We conclude that under the facts before us, the trial judge's absence is not, standing alone, structural error. In so finding, we do not hold that the trial court's absence from the bench may never amount to structural error. There may be circumstances under which a judge's absence is so prejudicial as to require relief, whether the issue is waived or not. However, we cannot hold that every absence will automatically require relief. Taken at face value, and assuming without deciding that the trial court left the bench, the facts before us simply do not justify a finding that this error affected the entire framework of the trial or, as Coddington argues, resulted in a complete breakdown of the trial process.

¶ 38 For facts such as these, the question on appeal must be the effect of the trial court's absence on the proceedings, and whether this effect deprived the defendant of a fair trial. This requires assessing the alleged error along with the evidence presented and circumstances of the trial. Such an assessment puts this error clearly within the category of trial error. Our conclusion is supported not only by the decisions of the majority of other state and federal jurisdictions, but of our own previous cases. Before *Fulminante*, we treated a judge's absence from the bench as error which might or might not require relief, based on the circumstances of the case. Our decision today is consistent with those cases.

¶ 39 We review Coddington's claim as one of trial error, and look to see whether Coddington was prejudiced by the trial court's absence from the bench. Coddington claims it is impossible to know the prejudicial effect the trial court's absence may have had on the jury, and argues that this Court must find the judge's absence prejudicial precisely because its harm is unquantifiable. The Alabama Court of Criminal Appeals addressed this argument in *Jackson*, 836 So.2d at 943. That court noted the absence in the record of any suggestion that the defendant was prejudiced by the trial judge's absence, and the defendant's failure to allege on appeal any specific prejudice from the error. *Id.* Here, Coddington fails to allege any specific preju-

díce. He claims that the trial court's absence might have suggested to jurors that Hood's videotaped testimony was not important. As the Fourth Circuit said, this encourages the Court to grant relief based on speculation. *Love*, 134 F.3d at 605. Neither the trial record nor Coddington's affidavits indicate that he was prejudiced in any way if the trial judge briefly left the bench.

¶ 40 We hold that, under the facts presented here, a trial judge's absence from the bench during the course of proceedings is a trial error, not a structural error, and subject to harmless error analysis. This claim of error may be waived, either by a defendant's express consent to the judge's absence, or by implication if a defendant fails to object. The trial court may cure error by ceasing proceedings during its absence, or by explaining the absence to jurors, being available to make relevant rulings, giving notice to all parties, and getting the parties' consent to any absence. Assuming without deciding that the trial court in this case may have briefly left the courtroom while Hood's videotape was played for jurors, Coddington fails to show any prejudice.

¶ 41 This Court wishes to emphasize to trial judges the importance of remaining on the bench throughout trial proceedings. If, for any reason, the judge must leave the courtroom, the judge should at a minimum notify all parties, offer an explanation, and grant a brief continuance until the judge returns to the courtroom.

## TRIAL ISSUES

¶ 42 In Proposition V, Coddington claims his right to notice and an opportunity to be heard were violated by the State's reliance on statements he made while testifying at his prior trial to support the "avoid arrest" aggravating circumstance. Coddington testified at his first trial, explaining the circumstances of the crime. His entire testimony was admitted into evidence in the resentencing trial. The State relied on Coddington's testimony that he committed the murder to avoid arrest or prosecution in support of that alleged aggravating circumstance. Coddington claims the State failed to give him sufficient notice that it intended to use this testimony to support that aggravating circumstance. While Coddington objected generally to admission of his previous testimony by transcript, on the grounds of fairness, he did not object on these grounds and has waived all but plain error. *Walker v. State*, 1994 OK CR 66, ¶ 53, 887 P.2d 301, 317.

¶ 43 The State must give a defendant notice before trial of evidence it intends to offer in support of alleged aggravating circumstances. 21 O.S.2001, § 701.10(C). Although the notice need not include a detailed description of the proposed evidence, it must be sufficient for the defendant to explain or defend against the proposed evidence. *Mitchell*, 2006 OK CR 20, ¶ 28, 136 P.3d at 685; *Littlejohn*, 2004 OK CR 6, ¶ 17, 85 P.3d at 295. The State argues that the notice requirement was satisfied, because this evidence was introduced at the guilt phase of Coddington's trial. However, the State relies on *Walker v. State*, 1994 OK CR 66 ¶ 58, 887 P.2d at 317, and *Boyd v. State*, 1992 OK CR 40, ¶ 16, 839 P.2d 1363, 1368. Neither of those cases involved a resentencing hearing. In context, the Court held only that the notice requirement was satisfied in those cases because the State had given notice of the evidence it would present in the guilt and innocence stages, which were part of the same proceeding. To hold notice was satisfied by the fact testimony was given in a trial five years earlier is contrary to the letter and spirit of the capital punishment notice statute. The State was required to comply with § 701.10(C) and provide Coddington with sufficient notice to allow him to defend against the alleged aggravating circumstances.

¶ 44 The State gave primary notice of the evidence it planned to offer in support of alleged aggravating circumstances through its "Statement making More Definite and Certain On Re-trial," filed July 23, 2007 [Statement]. Coddington argues that this Statement did not give notice that the State intended to use his trial testimony against him. The first sentence of the section concerning the avoid arrest aggravating statements says, "The State will offer all of the

testimony and exhibits that were presented at the defendant's previous trial, both first and second stages." This certainly included Coddington's testimony. The Statement then alleges that the predicate crime for this aggravating circumstance was robbery, and goes on:

> The testimony will prove that the defendant worked with the victim, Albert Troy Hale, at the Honda Car Parts Store located at 10115 N.E.23rd Street in Nicoma Park, Oklahoma. The defendant was well known to the victim and could easily be identified by the victim if the victim were left alive. The defendant robbed the victim and thought he had left him dead when he left the residence.

All this information is contained within Coddington's trial testimony, and further gave notice that the State intended to use that testimony. The Statement then describes certain statements Coddington made to police after his arrest. There is no question that Coddington was generally on notice that his trial testimony would be used to support this aggravating circumstance. *Mitchell*, 2006 OK CR 20, ¶ 28, 136 P.3d at 685–86.

¶ 45 Coddington correctly argues that the Statement did not specifically put him on notice that the State planned to use his testimony that he committed the crime because he didn't want to get caught, and to avoid arrest and prosecution. This Court must decide whether this particular testimony is substantively different from Coddington's other statements which were clearly contained within the Statement, such that he was prejudiced by the lack of specific notice. *Black*, 2001 OK CR 5, ¶ 94, 21 P.3d at 1077. This is not a case where the defendant was unaware of the specific content, or even the nature, of the testimony until after trial began. *See Littlejohn*, 2004 OK CR 6, ¶ 18, 85 P.3d at 295 (pretrial notice of witness's testimony omitted relevant and very damaging statements by defendant). The use of the evidence is a factor in determining the importance of its omission from the Statement. *Littlejohn*, 2004 OK CR 6, ¶ 22, 85 P.3d at 296. The State relied heavily on this statement to support this aggravating circumstance. However, other evidence also

supported a conclusion that Coddington committed the murder to avoid arrest or prosecution. This included portions of the transcript to which Coddington does not object, and his own statements to police describing the circumstances of the crime. Coddington claims that the prejudice flows entirely from the State's reliance on this testimony. He offers no other way in which he was prejudiced by admission of this testimony, and fails to describe any way in which he would have defended against this material differently had he known the State intended to rely on this specific testimony. *Black*, 2001 OK CR 5, ¶ 94, 21 P.3d at 1077. Coddington fails to show he was prejudiced by any possible deficiencies in the State's notice regarding evidence in aggravation.

¶ 46 In Proposition VI, Coddington claims the State presented insufficient evidence to prove that he killed Hale in order to avoid arrest or prosecution, and asks the Court to vacate the "avoid arrest" aggravating circumstance. As discussed in Proposition V, the State relied in part on Coddington's testimony to prove that he murdered Hale to avoid arrest or prosecution. Coddington claims that his testimony was insufficient to prove this aggravating circumstance. When considering a challenge to evidence of an aggravating circumstance, this Court considers whether, in the light most favorable to the State, any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. *Hanson v. State*, 2009 OK CR 13, ¶ 42, 206 P.3d 1020, 1032–33. The State must support this aggravating circumstance with proof that Coddington committed a predicate crime, separate from Hale's murder, and killed Hale to avoid arrest or prosecution for that predicate crime. *Hanson*, 2009 OK CR 13, ¶ 49, 206 P.3d at 1033; *Lay v. State*, 2008 OK CR 7, ¶ 34, 179 P.3d 615, 624. The State alleged that the predicate crime here was robbery, and that Coddington killed Hale to avoid arrest for taking $525 in cash from him.

¶ 47 Coddington argues that his testimony from the first trial cannot support this aggravating circumstance. He testified that he left Hale's house without calling police because he did not want to get caught,

and agreed that he wanted to avoid arrest or prosecution. He also testified, and told police, that he hit Hale with the hammer first, and grabbed the cash from Hale's pocket just before he left. Coddington said he thought Hale was dead when he left the scene. Coddington argues that taken together these statements do not provide sufficient proof of a predicate crime. He claims this merely reflects how Coddington felt when he left the scene of the murder, but does not show that he killed Hale to avoid being caught for robbery. He insists that robbery cannot be the predicate crime because he had already hit Hale before he robbed him. In similar circumstances, this Court found that a murder occurring contemporaneously with a robbery was nevertheless distinct from it, because evidence showed the defendant intended to rob the victim and was prepared to kill to get the money he sought. *Wackerly v. State*, 2000 OK CR 15, ¶¶ 40–41, 12 P.3d 1, 14. Evidence here also shows that Coddington, who was in the middle of a string of robberies at the time of the crime, went to Hale's house to borrow money, intended to get money, attacked Hale after Hale refused to loan him money, and robbed him before leaving. Sufficient evidence supports a conclusion beyond a reasonable doubt that Coddington committed the predicate crime of robbery.

¶ 48 Sufficient evidence also supports a conclusion beyond a reasonable doubt that Coddington killed Hale to avoid arrest or prosecution for the robbery. "[A] defendant's intent is critical to a determination of whether he killed to avoid arrest or prosecution." *Wackerly*, 2000 OK CR 15, ¶ 42, 12 P.3d at 14. Ample evidence showed that Hale knew Coddington well and could identify him. Coddington's statements to police, as well as his testimony at his first trial, show that he wanted to avoid being caught for this robbery. This was supported by evidence that Coddington also attempted to avoid being arrested for the other robberies he committed during this same period of time. Direct and circumstantial evidence support the jury's finding of this aggravating circumstance. *Wackerly*, 2000 OK CR 15, ¶ 43, 12 P.3d at 14–15.

¶ 49 In Proposition VII, Coddington asks this Court to reconsider its holding in *Hogan v. State*, 2006 OK CR 19, 139 P.3d 907, that jeopardy does not attach when a court dismisses or the jury does not find an aggravating circumstance. At Coddington's first trial, the State alleged four aggravating circumstances: that the murder was heinous, atrocious or cruel, that Coddington committed the murder to avoid arrest or prosecution, that Coddington had been previously convicted of a felony involving the use or threat of violence, and that Coddington posed a continuing threat to society. The aggravating circumstance that Coddington committed the murder to avoid arrest was not submitted to the jury. Jurors found that the murder was heinous, atrocious or cruel, and that Coddington had been previously convicted of a felony involving the use or threat of violence. Upon this Court's remand for resentencing, the State re-alleged all four aggravating circumstances in the Bill of Particulars. Coddington filed an objection to the re-allegation of the "avoid arrest" and continuing threat aggravating circumstances. Coddington argued that, because the jurors in the first trial failed to find these aggravating circumstances, the State's use of them in the resentencing proceeding violated double jeopardy and due process. Coddington admitted that our case law is contrary to this position. The trial court heard argument on this motion after voir dire was completed and before the jury was sworn, and overruled it.

¶ 50 Coddington raises the issue again on appeal. This Court rejected this claim in *Hogan*, 2006 OK CR 19, ¶¶ 52–59, 139 P.3d at 926–30. The Court thoroughly examined all aspects of this issue in *Hogan*, and concluded that the jury's failure to find a particular aggravating circumstance did not amount to an acquittal of the death penalty, where jurors found at least one aggravating circumstance. *Hogan*, 2006 OK CR 19, ¶ 56, 139 P.3d at 928. The Court further found that the jury's failure to unanimously find a particular aggravating circumstance beyond a reasonable doubt did not amount to a unanimous finding that the aggravating circumstance did not exist at all. *Hogan*, 2006 OK CR 19, ¶ 58, 139 P.3d at 929–30. Coddington

offers this Court no reason to reconsider our decision in *Hogan*. *See, e.g., Harris v. State*, 2007 OK CR 28, ¶ 13, 164 P.3d 1103, 1110. Jeopardy did not attach, regarding the allegation of aggravating circumstances, with the jury's decision in Coddington's first trial. The State was not barred from retrying Coddington, and alleging and presenting evidence to support these aggravating circumstances.

■ ¶ 51 In Proposition VIII, Coddington argues that the admission of juvenile offenses to support the "continuing threat" aggravating circumstance violates the Eighth Amendment prohibition against cruel and unusual punishment. Among the evidence the State offered to support the continuing threat aggravating circumstance were two offenses Coddington committed as a juvenile. Nina Taylor testified that Coddington came to her house late one night in 1988, banged on the door, and broke a window before fleeing. He was caught by sheriff's deputies shortly afterwards. Coddington was fifteen. Michael Oxley testified that in 1985, when Coddington was thirteen, Coddington beat him up and stole his bicycle. Although Coddington was apparently adjudicated delinquent in connection with each incident, the State did not admit evidence of the delinquency adjudications. Coddington did not object to this evidence, and we review this claim for plain error. *Malone v. State*, 2007 OK CR 34, ¶ 84, 168 P.3d 185, 218.

■ ¶ 52 Coddington now complains that evidence of juvenile offenses should not have been admitted to support the State's allegation that he poses a continuing threat to society. This court has previously held unadjudicated offenses and juvenile offenses are admissible to support a claim that the defendant is a continuing threat. *Douglas v. State*, 1997 OK CR 79, ¶¶ 85–87, 951 P.2d 651, 675–76. Coddington argues that the use of juvenile offenses violates the Eighth Amendment under *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (execution of persons who were under 18 when they committed a crime violates the Eighth and Fourteenth Amendments). The Court thoroughly reviewed and rejected this claim in *Mitchell v. State*, 2010 OK CR 14, ¶¶ 83–87, 235 P.3d 640, 659–60. Coddington offers no reason to revisit this decision.[4]

¶ 53 In Proposition IX, Coddington argues the use of non-violent felony convictions to prove the "prior violent felony" aggravating circumstance violated his right to a fair trial and reliable sentencing proceeding, and claims the evidence should have been excluded in the required *Brewer* hearing. The State alleged that Coddington had been previously convicted of a felony involving the use or threat of violence. To prove this the State must show beyond a reasonable doubt that he had been previously convicted of a felony involving violence or the threat of violence to a person. 21 O.S.2001, § 701.12(1). Coddington did not object to the evidence offered to support this aggravating circumstance, and we review for plain error.

■ ¶ 54 Coddington argues this aggravating circumstance must be dismissed because there was no evidence that he had any prior convictions involving the use or threat of violence. He admits the State offered six convictions for first degree robbery to support this aggravating circumstance. Those robberies occurred in the short span of time before and after Coddington murdered Hale. He confessed to them at the same time he confessed to Hale's murder, and was not convicted of them until after he was charged with murder. Coddington argues that for this reason these convictions may not be used to support this allegation. On the contrary, this Court has held that prior violent felony convictions include any convictions Coddington had before the sentencing date of the charged crime. *Hammon v. State*, 2000 OK CR 7, ¶ 40, 999 P.2d 1082, 1092; *Miller v. State*, 1998 OK CR 59, ¶ 55, 977 P.2d 1099, 1111. These convictions alone support a

---

4. In this proposition Coddington claims that the error, admission of testimony about juvenile offenses, was compounded by prejudicial statements made in the State's closing argument. Coddington fails to cite to the trial transcript of the State's argument. We will not search the record without citation to authority. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2010). As admission of the evidence was not error, discussion of the evidence in argument would be appropriate.

finding beyond a reasonable doubt that Coddington had been convicted of prior violent felonies.

■ ¶ 55 In addition to the robbery convictions, the State presented evidence that Coddington had three prior convictions for second degree burglary, and one conviction for unauthorized use of a motor vehicle. To support the latter conviction the State presented the victim, Marcos. Marcos testified that Coddington accosted him one night as Marcos pulled into a parking lot. Coddington yelled at him, kicked Marcos's car and threw punches at him. When Marcos got out, Coddington ran away and returned with a baseball bat. As Marcos tried to drive away Coddington hit him and the car with the bat. When Marcos escaped from the car Coddington took it and crashed it. Although unauthorized use of a motor vehicle is not inherently a crime of violence, Marcos's testimony proved that this particular conviction did involve the use and threat of violence to his person. It was properly admitted to prove that Coddington had prior violent felony convictions. On the other hand, the State does not attempt to argue that Coddington's second degree burglary convictions were properly admitted in support of this aggravating circumstance. Nothing in the record suggests they involved the use or threat of violence, and they should not have been admitted.

■ ¶ 56 Coddington correctly states that the record does not reflect the trial court conducted a *Brewer* hearing on the evidence offered to support this aggravating circumstance.[5] However, this failure does not require relief. The details of the convictions alleged to support the allegation that Coddington had prior violent felonies were admissible in support of the State's claim that Coddington presented a continuing threat to society. *Cole v. State*, 2007 OK CR 27, ¶ 50, 164 P.3d 1089, 1100.

■ ¶ 57 Coddington claims that use of the same evidence to show both that he had

prior violent felonies and that he poses a continuing threat to society is duplicative and cumulative. This court has rejected this claim. *Rojem v. State*, 2006 OK CR 7, ¶ 65, 130 P.3d 287, 300. Evidence of the robberies and the circumstances surrounding Coddington's unauthorized use of Marcos's vehicle, along with evidence of other criminal or violent encounters, was offered to show that Coddington routinely attacked others or used threats of violence to get his way, and to suggest that he would continue to do so.

■ ¶ 58 Evidence that Coddington had three convictions for second degree burglary should not have been admitted to support this aggravating circumstance. However, ample evidence that Coddington had prior convictions which involved the use or threat of violence was properly admitted to support this allegation. Given the admissible evidence supporting the jury's finding, the error in admitting evidence of Coddington's burglary convictions is harmless.

■ ¶ 59 In Proposition X, Coddington claims the overbroad application of the heinous, atrocious, or cruel aggravating circumstance renders the aggravator invalid under the federal and Oklahoma constitutions. Before trial Coddington filed a motion to strike the heinous, atrocious or cruel aggravating circumstance as unconstitutionally vague and overbroad. This motion was denied after a hearing. On appeal, Coddington again claims the aggravating circumstance is unconstitutional. Coddington admits this Court has narrowed the jury's discretion in applying this aggravating circumstance. *DeRosa v. State*, 2004 OK CR 19, ¶¶ 94–96, 89 P.3d 1124, 1155–57. To support this aggravating circumstance the State must prove beyond a reasonable doubt that the defendant inflicted either torture, including great physical anguish or extreme mental cruelty, or serious physical abuse, and that, for great physical anguish or serious physical abuse, the victim experienced conscious physical suffering be-

---

5. A trial court must, after a hearing, find that evidence offered in support of this aggravating circumstance shows that a defendant's prior convictions involved either violence or the threat of violence. Upon such a finding a defendant must

be offered the chance to stipulate that the prior convictions involved the use or threat of violence. *Brewer v. State*, 1982 OK CR 128, ¶¶ 41–42, 650 P.2d 54, 63.

fore death. *DeRosa,* 2004 OK CR 19, ¶ 96, 89 P.3d at 1156. The Court has repeatedly reaffirmed this definition and the accompanying instruction, which was given in Coddington's resentencing trial. *See, e.g., Cole,* 2007 OK CR 27, ¶ 37, 164 P.3d at 1098, and cases cited therein. Coddington did not object to the instruction on the heinous, atrocious or cruel aggravating circumstance given at trial. Insofar as he complains about the instruction during the course of this proposition, we review for plain error. There is none. Coddington's jury was properly instructed on this aggravating circumstance.

¶ 60 Coddington suggests that the OUJI–CR(2d) instruction on this aggravating circumstance, and the aggravating circumstance itself, are inadequate because they do not require that the torture or serious physical abuse are separate, intentional acts apart from the homicide itself. That is, Coddington would add a separate requirement that the defendant must have intended to torture or abuse the victim, in addition to committing whatever action resulted in the victim's death. This is not the law, and Coddington offers no authority suggesting it should be. Coddington refers to this Court's comment that violence supporting the heinous, atrocious or cruel aggravating circumstance should be gratuitous. *Hawkins v. State,* 1994 OK CR 83, ¶ 43, 891 P.2d 586, 596–97. This Court held in *DeRosa* that the reference to "gratuitous" violence was not a binding definition of "serious physical abuse". *DeRosa,* 2004 OK CR 19, ¶ 93, 89 P.3d at 1155. We recently reaffirmed our holding that this aggravating circumstance does not require proof of gratuitous violence. *Cuesta–Rodriguez,* 2010 OK CR 23, ¶ 80, 241 P.3d at 238–39. This Court has determined that the death penalty should be reserved for the "worst of the worst murderers". *Eizember,* 2007 OK CR 29, ¶ 150, 164 P.3d at 243. Through our discussion in *DeRosa,* the adoption of OUJI–CR(2d) 4–73, and its use in subsequent cases, this Court has appropriately narrowed the factfinder's discretion in capital cases as it considers allegations that a murder was especially heinous, atrocious or cruel.

¶ 61 Coddington's proposed requirement would reduce the focus of this aggravating circumstance solely to the defendant's intentions. This is not compatible with the nature of this particular aggravating circumstance. Guided by the text of a statute, this Court must give effect to the Legislature's intentions; this is particularly true when the statute is designed for a specific situation. *King v. State,* 2008 OK CR 13, ¶ 7, 182 P.3d 842, 844. Aggravating circumstances are determined by the Legislature and set forth in statute. 21 O.S.2001, § 701.12. A defendant may be eligible for the death penalty for eight statutory reasons. One aggravating circumstance focuses on the victim's employment. 21 O.S.2001, § 701.12(8)(victim is a peace officer or DOC guard on duty). Three focus on the nature of the crime. 21 O.S.2001, §§ 701.12(2), (3), (5) (creation of a great risk of death to more than one person, murder for remuneration, murder to avoid arrest or prosecution). Three focus on the offender. 21 O.S.2001, §§ 701.12(1), (6), (7) (defendant convicted of prior felonies involving the use or threat of violence, defendant serving a sentence of imprisonment for a felony conviction, defendant poses a continuing threat to society). Only the heinous, atrocious or cruel aggravating circumstance focuses exclusively on the way in which the crime affects the victim. 21 O.S.2001, § 701.12(4). The Legislature intended this aggravating circumstance to apply to crimes where the victim experiences conscious physical suffering or infliction of mental cruelty before death. This reflects the Legislature's determination that the extreme pain and suffering a murder causes a victim, by either its manner or the physical consequences of the act, may itself qualify a perpetrator for the death penalty. The statute does not suggest that a defendant must have intended extreme mental cruelty or conscious physical suffering. To impose such an interpretation would be to improperly shift the focus of this aggravating circumstance away from the victim. Such a result would not give effect to the Legislature's intent in creating the heinous, atrocious or cruel aggravating circumstance. Moreover, it is not necessary to narrow a factfinder's discretion when considering this aggravating circum-

stance. This Court should not adopt Coddington's additional requirement that any torture or serious physical abuse be intentional.

¶ 62 Within this proposition Coddington argues that the evidence was insufficient to support the jury's finding that the murder was especially heinous, atrocious or cruel. When considering a challenge to evidence of an aggravating circumstance, this Court considers whether, in the light most favorable to the State, any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. *DeRosa*, 2004 OK CR 19, ¶ 85, 89 P.3d at 1153. Coddington wants the Court to impose this requirement of intent on this aggravating circumstance because he argues that, if it were applied here, the evidence would not sustain a finding that he himself intentionally inflicted torture or serious physical abuse on Hale. The jury heard Coddington tell police that he left Hale for dead immediately after attacking and robbing him. The testimony concerning Hale's injuries and conscious physical suffering involved Hale's actions after Coddington left the scene. However, this Court should not create an intent requirement when considering whether the proof was sufficient for this aggravating circumstance.

■■ ¶ 63 In a single sentence, Coddington states, "If the Court finds that the aggravator does not require a finding that the torture or great physical abuse was inflicted with the intention of causing further suffering, the evidence does not sustain the aggravator in this case." This sentence appears to claim that, should the Court reject Coddington's suggestion that an intent requirement must be imposed, the evidence is insufficient to support the aggravating circumstance using the traditional analysis. Coddington offers no argument in support of this claim. It is not supported by the record. The jury heard Coddington's statements that Hale was on the kitchen floor when he left the house. Several witnesses testified that Hale was semi-conscious, moaning, in great pain, and attempting to communicate when he was found several hours after the crime. The medical evidence showed that Hale had defensive wounds as well as several extremely

serious wounds to the head and skull, which would have been very painful. Blood pools, blood spatter, transferred blood, bloody handprints, clothing and rags, and feces were found throughout Hale's kitchen, bathroom and bedroom. This evidence suggested that Hale had lost control of his bowels, regained consciousness, got up from the kitchen floor, moved into the bathroom, took off his clothes and tried to clean himself, and finally lay down on his bed. Taken in the light most favorable to the State, any rational trier of fact could find from this evidence that Hale's murder was especially heinous, atrocious or cruel.

¶ 64 The heinous, atrocious or cruel aggravating circumstance is not unconstitutional. Evidence supported the jury's finding that Hale's murder was heinous, atrocious or cruel.

■■■ ¶ 65 In Proposition XI, Coddington claims the trial court erred in allowing the presentation of cumulative evidence, which unfairly prejudiced him and resulted in an unfair sentencing determination. The State introduced testimony of four witnesses who described the scene of the crime and Hale's condition when he was found. Coddington claims this testimony, taken together, was prejudicially cumulative. Coddington neither cross-examined these witnesses nor objected to this testimony. We review these claims for plain error. There is none. Admission of evidence is within the trial court's discretion. *Goode v. State*, 2010 OK CR 10, ¶ 44, 236 P.3d 671, 680; *Coddington*, 2006 OK CR 34, ¶ 62, 142 P.3d at 454. Coddington raised a similar claim in his appeal from his first trial. There, we concluded that the trial court did not abuse its discretion in allowing two witnesses to testify about the scene, and a third to introduce photographs of the scene and the victim. *Coddington*, 2006 OK CR 34, ¶ 64, 142 P.3d at 454–55. The record in this trial supports the same conclusion.

¶ 66 Each of these four witnesses had a different role at the scene and testified to different observations. The first two responded while Hale was at the house and testified to Hale's condition and their initial impressions of the crime scene. Archer, an

emergency medical technician, arrived after paramedics. Hale was still lying, apparently unconscious, on his bed. Archer testified regarding Hale's position on the bed and wounds. He also described the blood and feces he saw in in the house. Archer testified that he helped bandage Hale and move him to an ambulance, where Hale moaned, said his head hurt, and drifted in and out of consciousness. Cox, a Choctaw police officer, responded to the scene after Hale was placed on the ambulance gurney. Cox saw blood on Hale's face and heard him mumbling and moaning, in pain. Cox explained that, in his opinion, the blood spatter and bloody handprints showed that Hale had not had an accident and fallen. Cox established the crime scene log. He also testified as to the house's temperature, which blood was pooled and which was dried, and the odor in the house.

¶ 67 The other two witnesses were law enforcement officers who testified about their role in the investigation. Gunn, an Oklahoma County sheriff's deputy, collected evidence after Hale was taken to the hospital. Gunn described the blood and feces evidence she saw throughout the house, including a large puddle of blood on Hale's bed, and her professional assessment of its significance. She testified that it appeared the assault occurred in the kitchen. Gunn collected soiled rags, underwear and Hale's bedding, as well as Hale's clothing. Several crime scene photographs were admitted during Gunn's testimony. Brandon was the Oklahoma County Sheriff's technical investigator. He testified about blood spatter interpretation and crime scene reconstruction he conducted. While Brandon's descriptions of the blood at the scene were similar to those of the previous witnesses, the focus of his testimony was different. Brandon discussed the ways in which blood spatter showed both the likely number of blows and their directionality, and how one could reconstruct both the attack and Hale's subsequent movements through the blood trail, transfers and smears from the kitchen to the bedroom. Brandon also described the defensive wounds on Hale's arms and hands. Several evidentiary photographs were admitted through Brandon's testimony.

¶ 68 The trial court did not abuse its discretion in allowing four witnesses to testify regarding different aspects of the same evidence. The testimony was relevant to the allegations that the murder was heinous, atrocious or cruel, and to corroborate other evidence including Coddington's account of the crime to police. The evidence was not so cumulative as to be prejudicial.

### INSTRUCTIONS

¶ 69 In Proposition XIII, Coddington claims reversible error occurred when the trial court modified OUJI–CR (2d) 4–77, eliminating the reasonable hypothesis standard from the instruction, and resulting in the jury being improperly instructed on the applicable standard of proof. The State offered both direct and circumstantial evidence to support the aggravating circumstances. Instruction 4–77, which sets forth the State's burden of proof regarding second stage circumstantial evidence, states: "All of the facts and circumstances, taken together, *must be inconsistent with any reasonable theory or conclusion other than the existence of the aggravating circumstance. All of the facts and circumstances, taken together,* must establish to your satisfaction the existence of the aggravating circumstance beyond a reasonable doubt." The trial court modified the instruction by removing the language in italics above. This modification conformed the language of the instruction to that in *Easlick v. State*, 2004 OK CR 21, 90 P.3d 556. Defense counsel objected generally to the instructions because several of the requested defense instructions were not given. Defense counsel did not object to this instruction at trial, and in fact defense counsel affirmatively agreed that this was among the instructions given which followed the uniform instructions. Coddington argues on appeal that this Court should not find the error waived for appellate review because counsel relied on the trial court's representation that this instruction was taken from OUJI–CR and had not been modified. There is no special exemption for counsel who fail to object because they rely on the trial court's statements. We review this claim for plain error.

¶ 70 We considered this issue in *Harmon v. State* and found that, because the *Easlick* standard applies to the second stage in criminal cases, the trial court did not err in modifying the uniform instruction. *Harmon*, 2011 OK CR 6, ¶ 57, 248 P.3d at 938. In so holding we rejected our previous conclusion that such a modification was error. *Id.*, discussing *Lay*, 2008 OK CR 7, ¶ 29, 179 P.3d at 623. We concluded in *Harmon* that the reasoning in *Easlick* applies equally to second stage circumstantial evidence instructions. *Harmon*, 2011 OK CR 6, ¶ 56, 248 P.3d at 938. *Easlick* held that it was not necessary to instruct jurors on the "reasonable hypothesis" test, because the *Spuehler* test was universal in nature and could apply equally well to direct and circumstantial evidence cases. *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04 (taking the evidence in the light most favorable to the state, any rational trier of fact could find the elements of the crime beyond a reasonable doubt). The trial court did not err in modifying OUJI–CR (2d) 4–77 by removing the reasonable hypothesis test.

¶ 71 In Proposition XIV, Coddington argues his sentencing proceeding was fundamentally flawed because his jury was not instructed that it must find that any aggravating factors must outweigh the mitigating circumstances beyond a reasonable doubt. The trial court overruled Coddington's request that jurors be instructed they must find the aggravating circumstances outweighed any mitigating evidence beyond a reasonable doubt. Coddington claims on appeal that a jury's finding of an aggravating circumstance is a fact increasing his penalty which must be proved beyond a reasonable doubt, and must outweigh any mitigating evidence beyond a reasonable doubt. We have repeatedly rejected this claim. *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 102, 241 P.3d at 244; *Mitchell*, 2010 OK CR 14, ¶ 127, 235 P.3d at 665; *Glossip v. State*, 2007 OK CR 12, ¶ 118, 157 P.3d 143, 161. Coddington's suggestion that this Court reconsider these decisions is not persuasive.

## ISSUES AFFECTING THE ENTIRE TRIAL

¶ 72 In Proposition XII, Coddington claims willful and accidental incidents of prosecutorial misconduct, from *voir dire* through closing argument, deprived him of a fair sentencing proceeding. He failed to object to any of the comments or arguments, and we review for plain error. *Browning v. State*, 2006 OK CR 8, ¶ 39, 134 P.3d 816, 840. Both parties have wide latitude to argue the evidence and inferences from it, and this Court will only find error where a grossly unwarranted argument affects a defendant's rights. *Browning*, 2006 OK CR 8, ¶ 35, 134 P.3d at 839. We evaluate claims of prosecutorial misconduct within the context of the whole trial, and will only grant relief if the misconduct effectively deprives the defendant of a fair and reliable sentencing proceeding. *Cuesta–Rodriguez*, 2010 OK CR 23 ¶ 96, 241 P.3d at 243.

¶ 73 Coddington first complains that the prosecutor equated justice with a death penalty verdict. The record does not support this claim. During *voir dire* the prosecutor asked virtually every prospective juror whether he or she agreed that the end result of the trial process should be justice, whatever that person considered justice to be, based on the law and evidence. Occasionally the prosecutor varied the question, asking whether potential jurors agreed that the end result should be justice no matter what that was, or no matter which of the three penalties it might be. In first closing, the prosecutor argued that based on the law and evidence jurors would render justice to Coddington by finding all the alleged aggravating circumstances and sentencing him to death. In second closing, the prosecutor argued that the jurors' verdict would represent what they believed to be justice based on the law and evidence, and that every person had their own feeling about what justice meant. The State argued that, based on the law and evidence, a verdict of death would represent justice. Taken as a whole these questions and arguments did not improperly equate justice with a death sentence. The *voir dire* comments explicitly mentioned all three punishments, or referred to "justice" as a concept defined by each individual which could encompass all three outcomes. *Mitchell*,

2010 OK CR 14, ¶¶ 99, 235 P.3d at 661. The arguments asking for the death penalty as a just verdict were based on the law and evidence, not on personal opinion, and were not improper. *Pavatt v. State*, 2007 OK CR 19, ¶ 63, 159 P.3d 272, 291.

■■■ ¶ 74 Coddington claims the prosecutors improperly told jurors, in *voir dire* and argument, that Hale's family wanted a sentence of death.[6] Before trial all parties agreed not to convey to jurors any recommendation of sentence made by Hale's family. The parties relied on Tenth Circuit case law which has held that previous law prohibiting families from recommending a sentence to jurors in a capital case had survived the U.S. Supreme Court decision allowing victim impact evidence in capital cases. *Hain v. Gibson*, 287 F.3d 1224, 1238–39 (10th Cir. 2002). By contrast, this Court has allowed families to recommend a sentence during victim impact testimony. *Williams v. State*, 2008 OK CR 19, ¶ 96, 188 P.3d 208, 227; *Harris*, 2007 OK CR 28, ¶ 12, 164 P.3d at 1110. Thus, if Coddington were correct, any error would not have violated Oklahoma law and would not require relief.

¶ 75 The record does not support Coddington's claim. The prosecutors did not tell jurors, either during *voir dire* or in argument, that Hale's family wanted a verdict of death. Throughout *voir dire* and again in argument the prosecutors told jurors that someone in the courtroom would be hurt by their verdict no matter what it was. Prosecutors stated several times that both families were hoping for an outcome. This statement implies that the families wanted different outcomes, but it does not say the victim's family members would ask jurors to recommend death.

■■■ ¶ 76 Coddington complains that the State invaded the province of the jury by telling jurors not to pick apart the State's

case. In context, the State told jurors it was not their job to pick apart the State's case or to play favorites for either side, but they were there to listen to the evidence fairly and impartially and render a true verdict. This neither suggested jurors should accept the State's case uncritically, nor suggested that jurors should disregard mitigating evidence. While awkwardly phrased, the comment did not misstate the jury's role.

¶ 77 In summary, the record does not support Coddington's claims of prosecutorial misconduct in *voir dire* and argument.

■■■ ¶ 78 In Proposition XV, Coddington claims he received ineffective assistance of trial counsel. Coddington claims that trial counsel was ineffective in presenting mitigating evidence, and for failing to object when the trial court left the bench during Hood's videotape. To prevail on a claim of ineffective assistance Coddington must show first that counsel's performance was deficient, and that the deficient performance was prejudicial, depriving him of a fair trial and reliable result. *Fisher v. State*, 2009 OK CR 12, ¶ 7, 206 P.3d 607, 609; *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Trial counsel's performance is measured by an objective standard of reasonableness under prevailing professional norms. *Harris*, 2007 OK CR 28, ¶ 29, 164 P.3d at 1114; *Rompilla v. Beard*, 545 U.S. 374, 380, 125 S.Ct. 2456, 2462, 162 L.Ed.2d 360 (2005). Coddington must show a reasonable probability that, absent counsel's deficient performance, the jury would have concluded the balance of aggravating circumstances and mitigating evidence did not support the death penalty. *Littlejohn v. State*, 2008 OK CR 12, ¶ 27, 181 P.3d 736, 745; *Harris*, 2007 OK CR 28, ¶ 29, 164 P.3d at 1114. A reasonable probability is one

6. In connection with this claim, Coddington argues that, because the alleged misconduct affected his Eighth Amendment rights, he need not show that it affected his entire trial. He relies on a Tenth Circuit case which grants relief for prosecutorial misconduct based on egregious error which deprived the defendant of his constitutional rights to present mitigating evidence, to rebut evidence and argument used against him, and to confront and cross-examine State witnesses. *Paxton v. Ward*, 199 F.3d 1197, 1217–18 (10th Cir.1999). This case specifically refers to a standard developed by federal courts for analyzing prosecutorial misconduct claims under special circumstances in federal habeas proceedings. It does not purport to set forth the standard of review this Court uses in analyzing misconduct claims for the first time on direct appeal.

sufficient to undermine confidence in the outcome. *Fisher,* 2009 OK CR 12, ¶ 7, 206 P.3d at 609. We consider counsel's choices from her perspective at the time, and give great deference to counsel's decisions. *Rompilla,* 545 U.S. at 380–81, 125 S.Ct. at 2462; *Wiggins,* 539 U.S. at 523, 123 S.Ct. at 2536. We presume counsel's conduct is professional and counsel's actions may be considered the product of a reasonable trial strategy. *Harris,* 2007 OK CR 28, ¶ 29, 164 P.3d at 1115. We will not find counsel ineffective if Coddington cannot show he was prejudiced by counsel's acts or omissions. *Williams,* 529 U.S. at 393, 120 S.Ct. at 1513 (defendant prejudiced where counsel's actions deny him a substantive or procedural right to which he is entitled by law); *Strickland,* 466 U.S. at 694, 104·S.Ct. at 2068.

¶ 79 Coddington first claims counsel was ineffective in presenting mitigating evidence. During the first stage of Coddington's first trial, Dr. Smith, a board-certified psychologist, testified in support of Coddington's defense of voluntary intoxication. Defense counsel for Coddington's resentencing trial chose not to present Dr. Smith's testimony again, but instead presented Dr. Ruwe, a clinical neuropsychologist. Coddington claims this decision had no strategic value and prevented him from presenting to jurors the effect of his substance addictions and abuse. He argues that Smith's testimony differed so significantly from Ruwe's that jurors were not given the opportunity to consider the mitigating effects of chemical addiction and the impact of drugs on Coddington's brain. Coddington claims Smith's testimony regarding voluntary intoxication was important because (a) it rebutted evidence that the murder was committed to avoid arrest and that it was heinous, atrocious or cruel, and (b) it was clearly mitigating because it went to Coddington's moral culpability or blame. Coddington argues Smith's testimony showed that, because of his drug and alcohol addiction and use, he was unable to use good judgment or make wise decisions and could not have intentionally either killed Hale or made him suffer. In making this argument Coddington relies on his own interpretation of the heinous, atrocious or cruel aggravating circumstance,

which would require an intent to torture or make the victim suffer. We rejected this interpretation in Proposition X.

¶ 80 The record does not support Coddington's claim. Smith's testimony was presented during the first stage of the first trial, not in mitigation. He reviewed Coddington's records, including a neuropsychological examination, a competency evaluation, hair analysis, Children's Hospital and other medical records, drug treatment, DHS and school records, family history, legal history, Coddington's statement to police, and the medical examiner and police reports. He also interviewed Coddington. Smith's testimony focused on the chemical, physical and psychological effects of cocaine and alcohol on the brain. He discussed the ways in which these substances affected the developing brain. Smith testified that Coddington was drug-dependent and addicted to cocaine. He specifically described the effect of cocaine use on various areas of the brain. Smith used Coddington's long history of head trauma and injuries, alcohol use, and substance abuse to illustrate the probable effects on Coddington's brain development. He testified that Coddington was unable to use good judgment, control his behavior, think, or make good decisions.

¶ 81 Ruwe's mitigation testimony was broader than Smith's, but substantially included the evidence Smith gave. Ruwe reviewed the records Smith reviewed, including Smith's own report and testimony, and conducted his own interview of Coddington. During his testimony, Ruwe testified as to Smith's findings and conclusions. Ruwe's testimony regarding alcohol and substance addiction was similar to, and in some ways more extensive than, Smith's. Ruwe emphasized the effects of substance abuse on the developing brain. Like Smith, he testified about the physical and neuropsychological characteristics of cocaine abuse and addiction on the brain, as well as on brain development. Ruwe discussed at length Coddington's probable delay in brain development and deficits in judgment, impulse control and ability to make good decisions. Ruwe explained how these characteristics were affected by Coddington's terrible childhood,

his history of physical abuse and injuries, his long-term addiction, and his substance abuse shortly before the crime. He explained that these factors combined to ensure that Coddington could not make good decisions or use good judgment during his encounter with Hale which led to robbery and murder. Ruwe testified about the ways in which Coddington's personality characteristics, influenced by his brain development, were affected by environment. Ruwe's testimony highlighted the ways in which Coddington's upbringing and substance abuse reduced his moral culpability.

¶ 82 The record supports our conclusion that counsel's decision not to present Smith's testimony was sound trial strategy. *Jones*, 2009 OK CR 1, ¶ 91, 201 P.3d at 891. Counsel's focus in the resentencing trial was necessarily different from the trial strategy employed during the first trial. Smith's testimony was offered to show that Coddington could not have formed the intent necessary to commit first degree murder. Ruwe's testimony was more expansive, including medical evidence of the effects of cocaine and other substances on Coddington's brain, thinking and judgment, and the effects of his entire history and upbringing. Smith's opinion that Coddington was too intoxicated to form the intent to commit murder was of minimal relevance in the resentencing trial, which was not concerned with Coddington's guilt. The mitigating effect of that testimony was fulfilled by Ruwe's testimony. Counsel's decision to rely on Ruwe's evidence, rather than present Smith's prior testimony, was a viable option and a reasonable strategic decision. *Id.* at ¶ 93, 201 P.3d at 892. "[W]here counsel makes an informed decision to pursue a particular strategy to the exclusion of other strategies, this informed strategic choice is virtually unchallengeable." *Harris*, 2007 OK CR 28, ¶ 33, 164 P.3d at 1116 (citation omitted).

¶ 83 Coddington claims that, as well as failing to present Smith's testimony, defense counsel failed to include as a mitigating circumstance that Coddington was severely impaired by cocaine intoxication. Insofar as this refers to a claim that Coddington was impaired at the time of the crime, the evidence to support such a claim is conflicting. Ruwe testified that Coddington admitted to both Smith and himself that he had used cocaine at Hale's house just before the crime, and had used methamphetamine and alcohol that day. Coddington neither told police officers this information in his statement, nor testified to it during his first trial. The record shows that jurors were instructed that Coddington was probably born drug-addicted, used drugs as a teenager, and voluntarily attended a drug treatment program. They were also instructed, "Head trauma, alcohol, illegal drugs, and a physically and emotionally impoverished home life during his formative years have harmed James Coddington neurologically. Damage remains to this day." Jurors were sufficiently instructed that they could consider Coddington's impairment by cocaine addiction in mitigation.

¶ 84 Coddington also claims that counsel was ineffective for failing to object when the trial judge left the bench during Hood's testimony. We note once again that the record fails to support this claim. For the purposes of this proposition, we assume without deciding that such an event occurred. Coddington cannot show he was prejudiced by counsel's failure to object. In Proposition I, we thoroughly discussed the substantive legal issues surrounding a claim that the trial court was absent for part of the proceedings. We first determined that the error created by that action is trial error, not structural. We subsequently determined that Coddington failed to show any prejudice from the judge's brief absence, and concluded that the error, if any, was harmless. As Coddington was not harmed if the trial judge left the bench, he cannot show he was prejudiced by the error. In connection with this claim, Coddington filed a "Notice of Extra–Record Evidence Supporting Propositions I and XV of the Brief of Appellant and, Alternatively, Rule 3.11 Motion to Supplement Direct Appeal Record Or For An Evidentiary Hearing". This document and its accompanying affidavits do not show by clear and convincing evidence there is a strong possibility that trial counsel was ineffective for failing to object when the trial court left the bench, if that occurred. Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals,*

Title 22, Ch.18, App. (2010). Coddington's application for an evidentiary hearing on this issue is denied.

¶ 85 Trial counsel made a reasonable strategic decision to present Ruwe's testimony rather than Smith's testimony from the previous trial. Coddington was not prejudiced by counsel's failure to object to the trial judge's absence from the bench, if that occurred. Coddington has failed to show counsel's performance was deficient. Trial counsel were not ineffective.

## APPELLATE ISSUES PREVIOUSLY DECIDED

¶ 86 In Proposition XVI, Coddington raises eight claims challenging jury instructions, the constitutionality of Oklahoma's capital punishment process, and the manner of execution. As Coddington notes, this Court has previously rejected all these claims; our consideration of them in this appeal preserves the issues for subsequent state or federal appellate review.

¶ 87 Coddington argues that the jury instructions on mitigating evidence, taken from the uniform jury instructions, used permissive language and did not require jurors to consider mitigating evidence. The trial court overruled Coddington's motion objecting to the permissive language in OUJI–CR(2d) 4–78. However, Coddington's requested additional instruction on mitigating evidence also uses permissive language, stating "Mitigating circumstances are those which you may consider in fairness, sympathy and mercy." This claim is waived. *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 101, 241 P.3d at 244.

¶ 88 Coddington claims that jurors were not specifically instructed that they could consider life or life without parole after finding an aggravating circumstance. He argues that the language of OUJI–CR(2d) 4–76 implies jurors may only impose a life sentence if they fail to find any aggravating circumstances. We have held otherwise. *Mitchell*, 2010 OK CR 14, ¶ 122, 235 P.3d at 664. The record reflects that jurors were specifically instructed that if they found aggravating circumstances outweighed mitigating circumstances, they "may impose a sentence of life imprisonment with the possibility of parole or life imprisonment without the possibility of parole." Throughout *voir dire* and in argument, both prosecutors and defense counsel reminded jurors that they were never required to impose the death penalty. There is no plain error.

¶ 89 Coddington argues that Oklahoma's death penalty scheme is unconstitutional for "claims of vagueness, overbreadth, abuse of prosecutorial discretion, arbitrariness and because it constitutes cruel and unusual punishment." Coddington fails to either cite any authority or make any specific argument in support of this claim. Instead, he attempts to "incorporate by reference the authorities relied on in his pre-trial motions on this issue." *Id.* Our Rules require all briefs to contain citations to authority and to the record, where appropriate, in support of a claim of error, and provide that a claim submitted without citation and argument is waived. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2010).

¶ 90 Coddington argues that Oklahoma's capital sentencing scheme requires jurors to make special findings of fact prohibited under Article VII, § 15, of the Oklahoma Constitution. He asks this Court to reconsider our decision rejecting the claim, but fails to support his request with argument or authority. The issue is waived. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2010).

¶ 91 The trial court overruled Coddington's requests for allocution and to argue last. Coddington again asks the Court to reconsider earlier decisions, without supporting argument or authority. The issue is waived. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2010).

¶ 92 Coddington argues that Oklahoma's lethal injection procedure violates the Eighth Amendment prohibition against cruel and unusual punishment. He specifically claims the use of pancuronium bromide may make him helpless but alert without preventing the pain associated with administration and use

of the other drugs in the protocol. The trial court denied Coddington's pretrial motion on this issue. Coddington also argues that Oklahoma's practice, process and personnel are systematically flawed as they (a) leave some decisions surrounding administration of the lethal agents to the administering personnel; (b) shield the identities of the persons administering the drugs, thus failing to create accountability; and (3) include no backup plan should a doctor be unavailable during the procedure. Coddington cites in support of these claims a document titled "Procedures for the Execution of Inmates Sentenced to Death", and a *New York Times* article on pancuronium bromide. We recently considered this same claim, supported by the same authorities, in *Cuesta–Rodriguez*, and rejected it for failure to provide a sufficient record to address the issue. *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 109, 241 P.3d at 246. As in *Cuesta–Rodriguez*, we cannot find, on the record before us, any substantial violation of the constitutional right against cruel and unusual punishment.

¶ 93 The trial court overruled the majority of Coddington's motions regarding victim impact evidence. On appeal, Coddington first claims that victim impact evidence acts as a "super-aggravator" in capital trials. He argues that this evidence diminishes the narrowing function aggravating circumstances are intended to provide, and asks the Court to reconsider its decisions rejecting that claim. *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 71, 241 P.3d at 236. Coddington offers no new arguments which would justify a different conclusion.

¶ 94 Coddington also argues that jurors were improperly instructed on the scope of victim impact evidence. The trial court gave OUJI–CR(2d) 9–45, which allows jurors to consider the victim as an individual whose death may represent a loss to society as well as his family. Coddington did not object to this instruction at trial, and we review for plain error. There is none. We thoroughly considered and rejected this argument in *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 74, 241 P.3d at 237.

## ACCUMULATED ERROR

¶ 95 In Proposition XVII, Coddington claims that individual trial errors, which may have been found harmless, require sentencing relief when considered together. We found no error in the majority of Coddington's propositions. In Proposition I, we assumed without deciding that error may have occurred and concluded that, if any error occurred, it was harmless. We found in Proposition IX that Coddington's convictions for second-degree burglary should not have been admitted to support the allegation that he had prior convictions involving the use or threat of violence to the person. However, given the admissible evidence supporting that aggravating circumstance, we concluded the error was harmless. As we found only a single, harmless, error, there is no cumulative error. *Rojem v. State*, 2009 OK CR 15, ¶ 28, 207 P.3d 385, 396.

## MANDATORY SENTENCE REVIEW

¶ 96 In Proposition XVIII, Coddington asks this Court to modify his sentence under its mandatory sentence review authority. This Court is required in every capital case to determine whether the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the evidence supports the jury's findings of aggravating circumstances. 21 O.S.2001, § 701.13(C). In this proposition, Coddington asks the Court to independently weigh the evidence presented at his resentencing trial, and to conclude that it does not support a sentence of death. This is not the Court's role. In conducting our mandatory sentence review, we analyze the record for any circumstances which may have improperly affected the jury's verdict. *Rojem*, 2009 OK CR 15, ¶ 22, 207 P.3d at 395. The Court is not acting as an independent factfinder, and we do not substitute our judgment for that of the jury's.

¶ 97 Coddington's jury was instructed on and found the existence of four aggravating circumstances: that the murder was heinous, atrocious or cruel, that Coddington committed the murder to avoid arrest or prosecution, that Coddington had been previously convicted of a felony involving the use or

threat of violence, and that Coddington posed a continuing threat to society. These findings were amply supported by the evidence.

¶ 98 Coddington presented evidence that his childhood was filled with trauma and physical and mental abuse; that he suffered injuries as a child and was a psychiatric inpatient for several months in Childrens' Hospital; that he suffered from cocaine addiction and alcohol and drug dependency, and had abused alcohol and drugs since an early age; and that these factors impeded his brain development and impaired his judgment, impulse control and ability to make decisions. Coddington also presented evidence that his family members loved him and to an extent blamed themselves for giving him a poor environment and upbringing which led to his drug addiction and Hale's murder; that Coddington tried to take care of his younger brother when they were children; that as an adult he had a caring and loving relationship with his girlfriend and her children; that he successfully completed drug treatment to further that relationship; that he was gainfully employed and a good worker when not using cocaine; and that he has matured and tried to help others while in prison. Coddington also introduced evidence that he pled guilty to six robbery charges, is serving six life sentences for those crimes, and threatened but did not harm those victims. Coddington also presented evidence of remorse.

¶ 99 Upon reviewing the trial, we find the death penalty was not imposed under the influence of passion, prejudice or any other arbitrary factor. There was no improper evidence or argument which could have improperly affected the jury's verdict. Jurors had the opportunity to hear and consider Coddington's mitigating evidence, and the record provides no reason to disturb their verdict. The sentence of death is factually substantiated and appropriate.

### DECISION

¶ 100 The Judgment and Sentence of the District Court of Oklahoma County is **AF-FIRMED**. The Motion to Supplement the Record is **GRANTED**. The Motion for Evidentiary Hearing is **DENIED**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2011), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

A. JOHNSON, P.J., LEWIS, V.P.J., and C. JOHNSON, J, concur.

LUMPKIN, J., specially concur.

LUMPKIN, Judge: SPECIALLY CONCURRING.

¶ 1 I concur in the results reached in this case but write separately to address several issues.

¶ 2 As to Proposition I, the Court cannot use the affidavits submitted by Appellant and the State as substantive evidence regarding the issue raised. *Warner v. State,* 2006 OK CR 40, ¶ 14, 144 P.3d 838, 858. These *ex parte* affidavits, which have not been subjected to cross-examination, only go to the determination whether an evidentiary hearing is required. *Id.,* 2006 OK CR 40, ¶ 14 n. 3, 144 P.3d at 858 n. 3.

¶ 3 Further, we could have decided this issue based upon Oklahoma law and United States Supreme Court precedent without a tour of every jurisdiction in the United States. The Constitutional right at issue is the right to jury trial under the Sixth Amendment applied to the states through the Fourteenth Amendment. *Duncan v. Louisiana,* 391 U.S. 145, 148–58, 88 S.Ct. 1444, 1447–52, 20 L.Ed.2d 491 (1968). The United States Supreme Court has recognized that trial by jury necessarily includes the presence, "directance" and "superintendence" of a presiding judge. *Capital Traction Co. v. Hof,* 174 U.S. 1, 13–16, 19 S.Ct. 580, 585–86, 43 L.Ed. 873 (1898). The United States Supreme Court has not determined whether the mere momentary absence of a trial judge constitutes reversible error.

¶ 4 However, the issue of a trial judge's absence is not a matter of first impression for this Court. We have long recognized that a judge's absence from the bench does not automatically require reversal. Instead, "[o]n principle and reason the determining test is whether the judge has lost control of the proceedings. If he has done so, the

integrity of the trial is destroyed." *Tunnell v. State,* 24 Okl.Cr. 176, 216 P. 951, 952 (1923); *Elrod v. State,* 1974 OK CR 183, ¶¶ 5–6, 527 P.2d 208, 210 (finding no requirement that trial judge remain seated at all times at the bench); *Grant v. State,* 1963 OK CR 86, ¶¶ 7–15, 385 P.2d 925, 927–28 (finding that trial judge's momentary absence from the bench did not result in loss of control of proceedings requiring reversal); *Ridenour v. State,* 1951 OK CR 62, 94 Okl.Cr. 92, 231 P.2d 395, 405–06 ("By reason of our conclusion that the court lost that supervision and control of the court required in a criminal trial, the case is reversed and remanded for a new trial."); *Blagg v. State,* 36 Okl.Cr. 337, 254 P. 506, 509 (1927) (refusing to sustain the contention that trial judge was absent from the courtroom and lost control of proceedings as judge remained in a position to rule on any matter that might have arisen at the time he stepped into his chambers); *Allen v. State,* 13 Okl.Cr. 533, 165 P. 745, 746 (1917) (when the record affirmatively discloses that the judge lost control of the proceedings by reason of his absence from the bench during the progress of the trial then reversal is required); *Stites v. State,* 9 Okl.Cr. 596, 132 P. 822, 823 (1913); *Wright v. State,* 7 Okl.Cr. 280, 123 P. 434, 435 (1912); *Cochran v. State,* 4 Okl.Cr. 379, 111 P. 974, 977–78 (1910).

¶ 5 Thus, when the trial judge is absent and has lost control of the proceedings, the error constitutes reversible error. This result is supported by the various rulings of the federal courts on this issue. In *United States v. Mortimer,* 161 F.3d 240, 241–42 (3rd Cir.1998), the Third Circuit Court of Appeals found that the trial judge's absence constituted structural error when the prosecutor objected to defense counsel's closing argument but withdrew the objection "with the exclamation 'The judge is not here.'" In *Riley v. Deeds,* 56 F.3d 1117, 1119–22 (9th Cir.1995), the Ninth Circuit Court of Appeals, in refusing to determine whether every instance of a trial judge's absence constituted structural error, determined that "the complete absence of judicial discretion" that occurred when the judge's law clerk presided over the jury's request to have testimony read back during deliberations constituted reversible error.

¶ 6 When the trial judge's absence does not result in a loss of control over the proceedings then the error does not constitute structural error and may be found harmless. In *United States v. Kone,* 307 F.3d 430, 441–43 (6th Cir.2002), the Sixth Circuit Court of Appeals determined that structural error had not occurred when the trial judge was absent during jury deliberations and the return of the verdict. "This is not the case of a judge who completely abdicated his judicial responsibilities, as in *Mortimer,* but rather the case of a judge who presided telephonically at important stages of the trial." *Id.,* 307 F.3d at 443. The Second Circuit Court of Appeals in *United States v. Pfingst,* 477 F.2d 177, 195–97 (2nd Cir.1973), determined that reversible error did not occur although the trial judge was absent during jury deliberations for approximately two hours while giving a speech and was unable to immediately address a jury question as the trial judge "was able to 'assert authority' over the situation by telephone." *See also United States v. Grant,* 52 F.3d 448, 449 (2nd Cir.1995) (recognizing "practical distinction" "between the judge's necessary presence while functional proceedings are in progress, and a presence serving only to satisfy symbolic ritual"). In *United States v. Love,* 134 F.3d 595, 604–05 (4th Cir.1998), the Fourth Circuit Court of Appeals determined that a judge's absence during portions of the parties' closing arguments explained in advance by the need to work on other matters and with the provision that he was available at all times to rule on any objections constituted harmless error. In *Heflin v. United States,* 125 F.2d 700, 700–01 (5th Cir.1942), the Fifth Circuit found a defendant's substantial rights were not affected by the trial judge's unexpected absence during closing argument. The trial judge was absent for two or three minutes in an adjacent lavatory with the door closed. *Id.* No motion or objection occurred and counsel continued with closing argument. *Id.*

¶ 7 Most recently, the Tenth Circuit Court of Appeals in *United States v. Solon,* 596 F.3d 1206, 1210–12 (10th Cir.2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 213, 178 L.Ed.2d 128 (2010), determined that a trial judge's absence from the bench for just un-

der six minutes in the middle of defense counsel's closing argument did not constitute structural error. "[U]nlike in *Mortimer* and *Riley,* the judge in this case was available if needed and there were no objections to rule on or decisions for him to make while he was away from the bench." *Id.,* 596 F.3d at 1212. As such the error constituted trial error subject to harmless error review. *Id.*

¶ 8 Turning to the circumstances of the present case, regardless of the trial judge's presence at the bench the record reveals that the trial judge maintained authority and control over the proceedings. There were no objections to rule on or decision for the trial judge to make during the time that Appellant alleges that the trial judge was absent. If the trial judge left the courtroom, his absence occurred during the publication of the pre-admitted videotaped testimony of Appellant's mother and the trial judge was in an adjacent washroom and remained available to address any objection. Appellant's claim does not involve structural error. As he has not shown any prejudice from the alleged absence of the trial judge, reversal is not required. *McCormick v. State,* 1993 OK CR 6, ¶ 42, 845 P.2d 896, 903; 20 O.S.2001, § 3001.1.

¶ 9 Our review of the challenge in Proposition II, is only for plain error as Appellant waived appellate review of the issue by failing to raise a timely challenge before the trial court. *Simpson v. State,* 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698.

¶ 10 As to Proposition III, this Court has previously approved the struck juror method for seating a jury in a criminal case. *Jones v. State,* 2006 OK CR 5, ¶¶ 7–8, 128 P.3d 521, 533.

¶ 11 Our review of the challenge in Proposition IV, is only for plain error as Appellant waived appellate review of the issue by failing to raise a timely objection before the trial court. *Simpson,* 1994 OK CR 40, ¶ 23, 876 P.2d at 698. Further, this Court recently addressed this very issue in *Harmon v. State,* 2011 OK CR 6, ¶ 23, 248 P.3d 918, 931. "We have rejected this claim in the past and we find neither the bifurcated nature of this capital case nor the current practice of jury selection used in capital cases warrants a

different conclusion." *Id.* Plain error did not occur.

¶ 12 As to Proposition V, a separate notice for resentencing is not needed as 21 O.S. 2001, § 701.10a (4), itself, puts a defendant on notice of the evidence, unless the State seeks to call witnesses not included on the previous list of witnesses for trial, then a separate notice is required.

¶ 13 The opinion properly denies relief in Proposition IX. This Court has previously found that error in the admission of non-violent prior felony convictions is harmless in light of evidence establishing valid convictions for violent felonies. *Pickens v. State,* 1993 OK CR 15, ¶ 40, 850 P.2d 328, 338.

¶ 14 As to Proposition X, I see no need to pontificate on the outcome of this case were the Court to place an intent requirement upon proof of the especially heinous, atrocious, or cruel aggravating circumstance, since this is not the law. Appellant's single sentence allegation, within this proposition, that the evidence does not sustain the aggravating circumstance in this case is not supported by argument or authority. As such, we should not consider it. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2010); *Armstrong v. State,* 1991 OK CR 34, ¶ 24, 811 P.2d 593, 599.

¶ 15 As to Proposition XV, when a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. *Phillips v. State,* 1999 OK CR 38, ¶ 103, 989 P.2d 1017, 1043 (*citing Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984)). Further, the opinion properly denies Appellant's Rule 3.11 motion as the motion does not meet the standard the Court set forth in *Simpson v. State,* 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905–06.

¶ 16 Finally, as to Proposition XVI, I note that this Court has previously rejected claims that Oklahoma's lethal injection protocol violates the Eighth Amendment prohibition against cruel and unusual punishment or is flawed. *Harmon,* 2011 OK CR 6, ¶¶ 91–92,

248 P.3d at 946; *Malicoat v. State,* 2006 OK CR 25, ¶¶ 2–11, 137 P.3d 1234, 1235–39.